## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| RANGE OF MOTION PRODUCTS LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 1:21-cv-00105-JDL |
| THE ARMAID COMPANY INC., | ) ) ) |
| Defendant. | ) |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

This patent infringement case concerns therapeutic self-massage devices.  The Plaintiff, Range of Motion Products, LLC ("ROM"), owns U.S. Design Patent D802,155 S (the "D155 patent"), which claims "the ornamental design for a body massaging apparatus," as illustrated in the exemplary figure reproduced below:



FIG. 1

ECF No. 8-3 at 2.  ROM markets and sells a massage device called the "Rolflex," which embodies the design claimed in the D155 patent.  As I will explain more fully, the Defendant, The Armaid Company Inc. ("Armaid"), has historical ties to ROM and

the Rolflex: Armaid's owner, Terry Cross, was one of ROM's founding members, and is listed as the inventor on the D155 patent.

ROM alleges that an Armaid product—the "Armaid2," which Armaid began selling after Cross began to distance himself from ROM—infringes the D155 patent. ROM seeks a preliminary injunction preventing Armaid from marketing and selling the Armaid2. For the reasons that follow, I deny ROM's motion.

## I.  BACKGROUND

The following facts are derived from ROM's Complaint and from exhibits that the parties have attached to their written memos.[1]

### 1.  History of the Armaid and Rolflex Products

Cross is a physical therapist and inventor who, during the 1990s, developed and began marketing a self-therapy massage tool called the Armaid1. Cross sold the Armaid1 through Armaid, a corporation that Cross owns and controls. The Armaid1 is pictured below:



---

[1] At a case management conference conducted on June 30, 2021, the parties agreed that the documentary record they submitted was sufficient to resolve ROM's motion. *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 223 (1st Cir. 2003) (explaining that "evidentiary hearings are often desirable at the preliminary injunction stage," but an evidentiary hearing is not necessary "[i]f the trial court has before it competing submissions of evidentiary quality, or if the facts are essentially undisputed"); *see also Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) (noting that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings").

As can be seen in the picture, the Armaid1 consists of two oppositional arms—one fixed to the base, the other connected by an adjustable hinge apparatus—both of which contain cut-outs that hold massage rollers.  The user places their arm or wrist in between the massage rollers, and, by bringing the lateral handles together, uses the rollers to compress the arm or wrist for massage purposes.

The Armaid1 was a commercial success, and in 2015, Cross adapted the Armaid1 to create a new device, which he marketed under the brand name "Rubbit," and which is the Rolflex's immediate predecessor.  Cross's affidavit explains the differences between the Armaid1 and the Rubbit, which are also present in the Rubbit's later incarnation as the Rolflex.  Cross states in his affidavit that, unlike the Armaid1, he designed the Rubbit to be "not restricted to the arms," but rather "to reach and massage 95% of the body."  ECF No. 19-1 ¶ 6.  Cross explains that he made several modifications to the Armaid1 to effectuate the Rubbit's more comprehensive purpose.  First, he opened up the end of the hinge apparatus to allow the hinged arm to be removed from the rest of the device, turning the hinged arm into a "separate, two-handed, rolling tool that could be used anywhere on the body."  *Id.* ¶ 14.  He also altered the base of the device, creating "an inverted mushroom base that would be grippy and stable no matter where or what angle [the user] placed it."  *Id.* ¶ 16.  Finally, Cross asserts that he "increased the curve of the [Rubbit's] therapy arm to accommodate the larger foam rollers as well as accommodate the [user's] legs."  *Id.* ¶ 17.  The Rubbit, which Armaid began to sell in February 2016, is pictured below:



### 2.    ROM's Formation and Design Patent Application

In April 2016, Nic Bartolotta, another physical therapist involved in selling massage devices, introduced Cross to Brian Stahl, an attorney.  In May 2016, Bartolotta, Cross, Stahl, and an entity controlled by Stahl formed ROM.  All three of ROM's individual members were engaged in other businesses as well, and ROM's operating agreement provides that each member could "engage in any business activity for his own profit or advantage without the other Members' consent."  ECF No. 19-5 at 7.

On May 25, 2016, ROM's patent attorney, Heidi Eisenhut, filed the design patent application that resulted in the D155 patent.[2]  Cross signed the application as the inventor, and assigned his interest in the patent to ROM the same day.  The application claims "[t]he ornamental design for a body massaging apparatus, as

---

[2] In April 2016, Eisenhut filed an application for a utility patent covering certain aspects of the Rolflex, which Cross also signed as the inventor and assigned to ROM.

shown and described" in eight figures, one of which is reproduced below for illustrative purposes:



FIG. 1

ECF No. 8-3 at 2.  The application does not claim the size, color, or material of the design.  Additionally, the shapes delineated by the dashed lines—which are difficult to make out in the small image reproduced in this Order, but which outline the shape of the foam rollers—are expressly disclaimed from the design.

ROM then began to sell the Rolflex device.[3]  The Rolflex device is pictured below, for context only:

---

[3] There is evidence that some additional modifications were made by ROM in turning the Rubbit into the Rolflex device, but the details of any changes are not in the record, nor are they apparent from the two devices' visual appearances.  Additionally, neither party suggests that those changes are relevant, and I do not address the issue further.



The D155 patent issued on November 7, 2017, and in February of that year, ROM's pending utility patent application was initially denied.[4]

### 3.     Development of the Armaid2

Not long after ROM's formation and acquisition of the still-pending design patent application, the working relationship between Cross and ROM's other members began to deteriorate.   By October 2016, Cross was no longer actively involved in ROM, and he returned to focusing on Armaid.

Cross asserts in his affidavit that, after he distanced himself from ROM, he decided to make improvements to the Armaid1 based on customer feedback.   Among these changes, Cross states, was to eliminate the ball joint and extension at the Armaid1's base, and replace it with a solid, concave base to "mimic[] the curve of the thigh."   ECF No. 19-1 ¶ 55.   Cross also explains that he expanded the size and number of the size-selection slots in the hinge component.   These changes are embodied in the

---

[4] The current state of that utility patent application—which is not in the record— is unclear, but an affidavit filed in California state court and docketed at ECF No. 19-24 reflects that, as of July 2020, ROM was still pursuing patentability on that application.

Armaid2, which, like the Armaid1, is primarily designed to massage a user's arms. In the pictures below, the Armaid1 is on the left and the Armaid2 on the right:

 

### 4.    Alleged Infringement and California Litigation

On March 15, 2019, ROM's patent attorney—no longer Eisenhut—sent Cross a cease-and-desist letter, explaining that ROM had recently been made aware that Cross had exhibited the Armaid2 device at a conference, and asserting that the Armaid2 infringed the D155 patent.  In January 2020, Stahl and Bartolotta filed a complaint against Cross in California state court, asserting state-law tort, contract, and unfair-competition claims, primarily based on Armaid's marketing of the Armaid2 device.  Cross filed a counterclaim, seeking money that ROM allegedly owes him, as well as an accounting of ROM's financial records.  On November 10, 2020, the California court denied the plaintiffs' motion for a preliminary injunction prohibiting Cross from marketing the Armaid2, concluding that Stahl and Bartolotta had failed to establish a likelihood of irreparable injury based on their allegations of lost sales,

and had not shown a likelihood of prevailing on their breach of fiduciary duty claim. As of July 27, 2021, the California case was scheduled to go to trial in August 2021.

## 5.   Procedural History

ROM filed its Complaint in this Court on April 12, 2021, asserting one count of patent infringement under 35 U.S.C.A. § 271 (West 2021) (ECF No. 1), and filed its Motion for Preliminary Injunction on May 5, 2021 (ECF No. 8). The Court heard oral argument on July 27, 2021.

## II.  LEGAL STANDARD

"[A] party seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of relief, that the balance of equities is in its favor, and that an injunction is in the public interest." *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 629 (Fed. Cir. 2015); *accord Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015) ("To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest.").

The parties dispute whether the applicable legal standard for resolving ROM's motion derives from Federal Circuit or First Circuit law. The solution lies somewhere in the middle. "Because the grant, denial, or modification of a preliminary injunction is not unique to patent law," a court should generally "apply regional circuit law" to resolving such motions. *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1328 (Fed. Cir. 2018); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 394 (2006) ("[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases . . . ."). And indeed, "there is no meaningful difference between First Circuit and Federal Circuit law" regarding the basic four elements of the preliminary-injunction standard. *Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 594 F. Supp. 2d 97, 101 (D. Me. 2009).

However, the Federal Circuit has "built a body of precedent applying these general considerations to a large number of factually variant patent cases." *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998). Accordingly, a court should give "dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Macom Tech.*, 881 F.3d at 1328 (internal quotation marks omitted); *see, e.g.*, *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, No. 1:20-cv-10351-IT, 2020 WL 978037, at *2 (D. Mass. Feb. 28, 2020) (applying "the Federal Circuit's standard that a preliminary injunction shall not issue if the accused infringer raises a substantial question concerning either infringement or validity" (internal quotation marks omitted)).

## III. DISCUSSION

The parties hotly dispute the application of all four preliminary-injunction factors to the circumstances presented here. They also dispute a number of facts underlying the analysis of those factors. Because my ruling on the first and second factors are determinative, I do not address the third and fourth factors.

1.    **Likelihood of Success on the Merits**

Armaid contends that ROM cannot demonstrate a likelihood of success on the merits because the Armaid2 does not infringe the D155 patent.   "Determining whether a design patent has been infringed is a two-part test: (1) the court first construes the claim to determine its meaning and scope; (2) the fact finder then compares the properly construed claim to the accused design."  *Lanard Toys Ltd. v. Dolgencorp LLC* (*Lanard II*), 958 F.3d 1337, 1341 (Fed. Cir. 2020).  I begin, therefore, by construing the D155 patent.

A.    **Claim Construction**

Unlike utility patents, the "metes and bounds of [which] are established by the language of the claims," *Reddy v. Lowe's Cos.*, 60 F. Supp. 3d 249, 252 (D. Mass. 2014), "design patents typically are claimed as shown in drawings," and "claim construction is adapted accordingly," *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (internal quotation marks omitted).  Again, the D155 patent claims "[t]he ornamental design for a body massaging apparatus, as shown and described" in eight exemplary figures, three of which are reproduced below[5]:

---

[5] "Because a claimed design is better represented by an illustration rather than a description, . . . the preferable course ordinarily will be for a district court not to attempt to construe a design patent claim by providing a detailed verbal description of the claimed design." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015) (internal quotation marks omitted).  However, "there are a number of claim scope issues which may benefit from verbal or written guidance, among them the distinction between features of the claimed design that are ornamental and those that are purely functional." *Id.*



ECF No. 8-3 at 2.  Recall that the rollers themselves—represented in the images by dashed lines—are not claimed in the D155 patent.  Additionally, the D155 patent does not specify the size, color, or material of the article; only the ornamental design.

"[T]he scope of a design patent claim 'must be limited to the ornamental aspects of the design.'"  *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (quoting *Ethicon Endo-Surgery*, 796 F.3d at 1333).  "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."  *Id.* (internal quotation marks omitted).  Factors that "may serve as a useful guide for claim construction functionality" include:

> [W]hether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specified utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Id.* (internal quotation marks omitted).

Here, the patented design is for a "body massaging apparatus," ECF No. 8-3 at 2, and, as ROM concedes, necessarily includes elements that serve that function. ROM does not attempt to distinguish between the aspects of the D155 patent that are functional and those that are ornamental, instead arguing more generally that although "certain elements of the design of the [D155 patent] serve a function, such as the arms for clamping, this does not prevent them from also having a protectable ornamental design." ECF No. 26 at 5. ROM is correct that the functional elements of the design may also have ornamental aspects, but the task at this stage of the analysis is to identify the features of the claimed design that are ornamental (and therefore part of the protected design) and those that are functional (and therefore not protected). *See Sport Dimension*, 820 F.3d at 1320.

Although a visual design is not strictly divisible, and neither party systematically enumerates the elements making up the design, it is clear to the Court that the D155 patent consists of a number of basic, identifiable elements. These include: a rounded base; a lateral hinge apparatus with six vertically oval size-selection slots; one clamshell arm fixed to the size-selection component; a second, oppositional clamshell arm connected to the hinge apparatus by the size-selection slots; a cut-out space in each arm for the insertion of foam rollers; and horizontal, cylindrical handles at the top of each arm. As I will explain, the record at this preliminary stage suggests that these basic elements, and resulting visual profile, are predominantly functional. This is particularly shown by the descriptions and claims contained in a utility patent that Cross obtained in connection with the

Armaid1 (the '081 patent) and ROM's marketing materials for the Rolflex device, as well as Cross's statements in his affidavit about the functions of several components.

The '081 patent—which issued in 1998—has expired, but nevertheless provides some insight into the basic functionality of all three devices (that is, the Armaid1, Armaid2, and Rolflex). For instance, the claims in the '081 patent include a device comprising two arms, one of which is "hingedly attach[ed]" to the other, with massaging members on each arm, and with arms that "are shaped and dimensioned to adjustably clamp a limb between [the] . . . massaging members." ECF No. 19-2 at 5. The description contained in the '081 patent also analogizes the hinge assembly to "those contained in adjustable pliers," *id.* at 4, and explains that the handles of each arm can be grabbed by the user's free hand and brought together. These descriptions support a finding that the basic shapes and elements of the design claimed in the D155 patent serve a function.

ROM's marketing materials for the Rolflex device, the commercial embodiment of the D155 patent, also support a finding that the basic elements and arrangement of the D155 patent are utilitarian. *See Sport Dimension*, 820 F.3d at 1320. ROM's website states that the Rolflex's "clam-shaped roller arms provide significant leverage, allowing users to clamp down and adjust the pressure to their liking," and that the device's "compact design . . . makes it convenient to take and use anywhere." ECF No. 19-14 at 8.

Additionally, in his affidavit, Cross explains the function of some of these basic elements. He states, for example, that the "clamshell appearance" of all three devices is "used for the 'leverage effect' that makes the devices work." ECF No. 19-1 ¶ 14.

He also addresses the D155 patent's base: "Because of the rounded nature of the shape it [can] be used at any angle." *Id.* ¶ 16.  Cross also asserts that he increased the curvature of the hinged arm, when designing the Rolflex/D155 patent, in order to "accommodate the larger foam therapy rollers as well as accommodate the [user's] legs." *Id.* ¶ 17.  However, Cross's affidavit discusses the arm curvature function only with respect to the difference between the Armaid1 and the Rolflex/D155 patent; he does not explain the reason that the Armaid2 has a symmetrical curve, unlike the Armaid1.

ROM does not dispute that many of the basic features and elements of the D155 patent are functional.  Instead, it argues that there are "countless" other designs that Armaid could have used for the Armaid2.  ECF No. 8 at 5.  This is significant to the claim-construction analysis because the availability of alternative designs suggests that the elements of the claimed design that could be altered are not purely functional.  *See Sport Dimension*, 820 F.3d at 1320.  In its memorandum, ROM suggests the following alterations to the Armaid2's design:

- "the U-shaped rungs could be designed to resemble a V-shape more closely";
- "the two oblong semi-C-shaped arms could be designed to resemble semi-F-shapes instead";
- "[t]he top of the semi-F-shaped arms could be connected to thick handles defining indents for engaging with a user's fingers, instead of the cylindrical bars connected to the top of the oblong, semi-C-shaped arms and forming two mirror T-shapes"; and
- "the horizontal piece could be connected to a flat bottom or a short stand connected to a flat or curved bottom, instead of being directly connected to a curved bottom."

ECF No. 8 at 5-6.[6]  Cross's affidavit explains why ROM's proposed alterations would reduce the Armaid2's functionality.  First, regarding the U-shaped rungs in the hinge apparatus, Cross asserts that a V-shape would lead to "wear and friction points that would degrade the surrounding plastic over time and usage."  ECF No. 19-1 ¶ 98. Next, Cross points out that the horizontal, cylindrical handlebars are "compatible with all sizes of fingers and hands without the restrictions and limitations of any indents."  *Id.* ¶ 99.  Cross also explains—as does ROM's website—that the Armaid2's and Rolflex's arms are C-shaped in order to encompass both massage rollers plus the user's limb, while providing sufficient leverage to perform the massaging function. Finally, Cross describes the Armaid2's unified, curved base as a "highly stable platform" that allows a user to focus on the "purpose of the product . . . without fussing with a strap or ball joint."  *Id.* ¶ 57.

Along the same lines, ROM points to the Armaid1's design as an example of an alternative design for the Armaid2, and writes in its motion that the Armaid1 "functioned as a self-massage device for a user's arms and hands, but did not embody the design of the D155 patent."  ECF No. 8 at 2.   The Armaid1 and Armaid2 are depicted below, in that order:

---

[6] ROM's assertions are not supported by an affidavit or any exhibits, such as illustrative drawings.




Despite their overlapping purposes—to massage the user's arms—the design and visual impression of the Armaid1 and Armaid2 certainly differ in some respects. For instance, the Armaid2's arms are shallowly and symmetrically curved, whereas the Armaid1's arms are more sharply curved up top but shallower below the rollers. The roller cut-out on the hinged arm of the Armaid1 is placed higher on the arm than on the Armaid2.  And the Armaid2's base is largely integrated into the hinge apparatus, but the Armaid1's base is separated from the hinge by an vertical extension and ball joint.

However, Armaid contends—again, supported by Cross's affidavit—that the design differences between the Armaid1 and Armaid2 are based on functional considerations.  Cross states that he eliminated the Armaid1's ball-joint base to increase stability, explaining that most customers never used the strap extension that the ball joint's flexibility was intended to work in tandem with.  The size and number of the size-selection slots in the adjustable hinge component, too, were expanded to accommodate a greater range of arm sizes.  However, Cross does not explicitly provide any utilitarian reason for the different arm curvatures between the

Armaid1 and Armaid2, such as generating consistent leverage given the greater range of arm sizes that the Armaid2 is intended to accommodate.

Cross's description of the D155 patent's basic shape and elements as functional, and not ornamental, is both reasonable and persuasive. ROM has submitted no evidence that rebuts Cross's explanations of these functional considerations. Instead, it simply repeats its argument that the Armaid1 and Armaid2 serve the same basic purpose—that is, in ROM's words, "to serve as a device that allows the user to self-massage a limb," ECF No. 26 at 5. But the question here is not whether an alternative design might still serve the same basic purpose; rather, it is "whether alternative designs would adversely affect the utility of the specified article." *Sport Dimension*, 820 F.3d at 1322 (internal quotation marks omitted). Cross's affidavit establishes that the alternative designs suggested by ROM would adversely affect the Armaid2's utility. The lack of available alternative designs for the Armaid2, therefore, supports a finding that the basic features of the D155 patent that are shared by the Armaid2—oval size-selection slots; one clamshell arm fixed to the size-selection component; another clamshell arm, attached to the size-selection component by an adjustable hinge; a cut-out space in each arm, for the insertion of foam rollers; and horizontal, cylindrical handles at the top of each arm—are purely functional.

There are, to be sure, some elements of the design claimed in the D155 patent that do appear to be ornamental. These include, for instance, the proportional length and ribbed surfaces of the handles; the thickness of the ridged outline of the entire device; the size and shape of the connection between the fixed arm and the hinge

component; the shape of the hinge component's extremity; and, perhaps, the degree of curvature of the arms, although the evidence is inconclusive as to whether this is also functional. However, as I have just described, most of the basic elements of the design are purely functional, and therefore lie outside the scope of the claimed design. Thus, the scope of the design claimed in the D155 patent is relatively narrow. *See Sport Dimension*, 820 F.3d at 1323 ("Because of the design's many functional elements and its minimal ornamentation, the overall claim scope of the claim is accordingly narrow.").

## B.  Substantially Similar

Having clarified the scope of the D155 patent, I now turn to consider whether the Armaid2 is substantially similar to the design claimed in the patent.

"In comparing the patented and accused design, the 'ordinary observer' test is applied—i.e., infringement is found 'if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.'" *Lanard II*, 958 F.3d at 1341 (alteration omitted) (quoting *Egyptian Goddess*, 543 F.3d at 670). "The infringement analysis must compare the accused product to the patented design, not to a commercial embodiment." *Id.*

When a claimed design "includes several elements, the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation." *Ethicon Endo-Surgery*, 796 F.3d at

1335.  "An element-by-element comparison, untethered from application of the ordinary observer inquiry to the overall design, is procedural error." *Id.*

However, as I have explained, the substantial-similarity test must also take into account the functional aspects of the claimed design—it is only the ornamental design, after all, that is protected. *See Lanard II*, 958 F.3d at 1344.  The question is not whether the overall design of the accused device is similar to the patented design; instead, the "court must consider the ornamental features and analyze how they impact the overall design." *Id.* at 1343; *see also id.* at 1344 (noting that the "correct context" for the infringement analysis is "the impact of the ornamental differences on the overall design").

The trial court's infringement analysis in *Lanard*—which the Federal Circuit described as "str[iking] the correct balance of considering the ornamental aspects of the design while remaining focused on how an ordinary observer would view the overall design," *id.* at 1344—is instructive. *See Lanard Toys Ltd. v. Toys "R" Us-Del., Inc.* (*Lanard I*), No. 3:15-cv-849-J-34PDB, 2019 WL 1304290 (M.D. Fla. Mar. 21, 2019).  That case involved toy chalk holders which were designed to look like a large No. 2 pencil, as shown below (the patented design is on the left; the accused product is on the right):



Fig. 1 '167 patent          Defendant's "Chalk Pencil"

*Lanard I*, 2019 WL 1304290, at *15. The court noted that "[p]lainly, the patented design and the accused design share a broad design concept" due to their similar functions, "and thus, at a conceptual level they look quite similar." *Id.* The court explained, however, that because the "similarities stem from aspects of the design that are either functional or well-established in the prior art," the overall similarities "do[] not mean the ordinary observer will be deceived into believing they are using the *same* design." *Id.* Instead, the court applied the ordinary-observer test to the relevant "frame of reference," *id.* at *16: *i.e.*, the "precise proportions of [the patented design's] elements, the size of the ferrule and the specific design of its grooves, and the particular size and shape of the conical end," *id.* at *15. After comparing the specific permutations of these elements in the two designs, the court concluded that the patented design was not infringed by the accused product "using the same elements with its own variations of form." *Id.* at *17 (alteration omitted) (internal quotation marks omitted).

ROM argues that the Armaid2 shares "nearly identical elements" with the D155 patent; according to ROM, these elements are "a horizontal piece containing U-

shaped rungs; two oblong, semi-C-shaped arms extending away from the horizontal piece; and two mirror T-shapes at the top of each arm." ECF No. 8 at 8. There is no doubt that, as in *Lanard I*, the silhouettes and basic visual impressions of the D155 patent and the Armaid2 are similar. However, the evidence presented at this preliminary juncture shows that this common basic shape—which appears to be the focus of ROM's complaint—is driven by purely functional considerations: the rungs in the hinge component are U-shaped to increase durability; the arms are clamshell-shaped for leverage; and the T-shaped handles are ergonomically compatible with different users and hand sizes.

Instead, the scope of the design claimed in the D155 patent is limited to its overall ornamental impression as represented in the exemplary figures. As I have described, that patented design includes the size and topography of the handles, the size and shape of the connection between the fixed arm and the hinge component, the shape of the hinge component's extremity, and the degree of curvature of the arms. However, I do not consider the ornamental effect of the respective designs' different bases—which Armaid argues is a crucial ornamental difference between the D155 patent and the Armaid2—because, as I have explained, the shape of each base is functional, not ornamental.

Nevertheless, considering the overall visual impression made by the D155 patent's ornamental elements, the Armaid2 is not substantially similar to the design claimed in the patent. Without undertaking an element-by-element comparison, I note that the bottoms of the fixed arms in each design are substantially different. The Armaid2 connects the fixed arm to the hinge component by a large rectangular

block, whereas the bottom of the D155 patent's fixed arm tapers directly down into the horizontal hinge piece.  And the hinge component's other extremity also varies between the two designs: In the D155 patent, it is a symmetrical curve (like the end of a hockey rink), whereas in the Armaid2's design, the bottom corner extends further to join the curve of the base.  The proportional size of the size-selection slots, too, is considerably larger on the Armaid2 than as shown in the D155 patent.

Additionally, the ridged outline of the D155 patent appears somewhat thicker than that of the Armaid2, which meaningfully alters the overall visual sense conveyed by the two designs—the D155 patent appears more robust and workmanlike, whereas the Armaid2 conveys a more stylized impression.  Finally, even if the curvature of the arms in the two designs is ornamental—as I mentioned, Cross's affidavit does not address any functional differences between the curvature in the Armaid2 and D155 patent—the curvature of the Armaid2's arms is shallower than the curve in the D155 patent.

Certainly, there are some commonalities between the ornamental appearance of both designs.  For instance, the flare of the fixed arm directly above the roller cut-out is similar in both designs, as is the shape and angle of engagement between each arm and the handlebar on top of it.  However, in comparing the overall ornamental designs, these similarities are significantly outweighed by the differences.  In sum, considering the visual effect of the ornamental designs as a whole, the two designs are not substantially similar.  Therefore, ROM has failed to establish a likelihood of success on the merits of its infringement claim.

2.       **Irreparable Injury**

A.       **Legal Framework**

Before turning to the parties' substantive arguments on the irreparable-harm factor, I must address ROM's contention that it is entitled to a presumption of irreparable harm if it has successfully established a likelihood of success on the merits.  Specifically, ROM writes in its motion, "In the context of a motion for a preliminary injunction, courts have consistently affirmed the notion that when a valid patent is likely infringed, the patentee is also considered to be likely to suffer irreparable harm."  ECF No. 8 at 9.  For reasons that Armaid identifies and that I will explain, this is an incorrect statement of the law.

Generally, "[t]he burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."  *Charlesbank Equity Fund II, L.P. v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Before 2006, the Federal Circuit had applied a patent-specific rule that irreparable harm would be "presumed when a clear showing has been made of patent validity and infringement."  *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987).  However, the Supreme Court's 2006 decision in *eBay* "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief" in patent cases.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).

In response, ROM suggests that, because *eBay* involved a permanent, not a preliminary, injunction, it did not undermine the Federal Circuit's pre-*eBay* cases applying a presumption of irreparable harm if a party seeking a preliminary

injunction established a likelihood of patent infringement.  The Federal Circuit has expressly acknowledged, however, that a court should "treat the irreparable harm factor the same in both the preliminary and permanent injunction contexts," *Apple Inc. v. Samsung Elecs. Co.* (*Apple II*), 735 F.3d 1352, 1361 (Fed. Cir. 2013).  Other lower courts, including at least one court in this District, have reached the conclusion that "[a]lthough *eBay* dealt with permanent injunctions, its holding applies equally to preliminary injunctions," and ROM does not cite any other cases to the contrary. *Acoustic Processing Tech., Inc. v. KDH Elec. Sys., Inc.*, 697 F. Supp. 2d 146, 156 (D. Me. 2010); *see also Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*, No. 11-CV-6183T, 2011 WL 3555833, at *2 (W.D.N.Y. Aug. 11, 2011) (collecting cases).

Therefore, there is no presumption of irreparable harm, and even if ROM had demonstrated a likelihood of success on its infringement claim—which, as I previously explained, it has not—it still bears the burden to establish that it would suffer irreparable injury without a preliminary injunction.

## B.   Whether ROM Has Established Irreparable Injury

"As its name implies, the irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address."  *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).  ROM argues that, without a preliminary injunction, it will suffer lost design exclusivity and market share, as well as business opportunities and goodwill, and that money damages will be inadequate to remedy these injuries.

The Federal Circuit has recognized that "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for

24

finding irreparable harm." *Id.*  However, "a bare assertion of irreparable harm is never sufficient to prove such harm or justify the extraordinary remedy of a preliminary injunction." *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, 967 F.3d 1339, 1349 (Fed. Cir. 2020) (internal quotation marks omitted); *see also Charlesbank Equity Fund II*, 370 F.3d at 162 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").  A plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

Additionally, "[t]o show irreparable harm, it is necessary to show that the infringement caused harm in the first place," because "[s]ales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple, Inc. v. Samsung Electronics Co.* (*Apple I*), 678 F.3d 1314, 1324 (Fed. Cir. 2012).  In other words, there must be "a showing of some causal nexus between [the defendant's] infringement and the alleged harm to [the patentee] as part of the showing of irreparable harm." *Id.*

### i.   Design Exclusivity

First, ROM argues that it is suffering irreparable harm due to the loss of its "design exclusivity." ECF No. 8 at 10.  However, it does not explain how this loss— which will, of course, occur every time that a design patent is infringed—causes it any concrete harm whatsoever, let alone irreparable harm.  *See Apple I*, 678 F.3d at 1325 (noting that although "a wholesale rejection of design dilution as a theory of irreparable harm" would be "improper," a patentee must present some concrete

evidence of design dilution in order to establish irreparable harm on that basis). Here, ROM has submitted no evidence that it has experienced any brand dilution or design erosion due to Armaid's alleged infringement.  ROM's assertion that it is losing design exclusivity, without more, does not establish irreparable harm.

### ii.   Lost Market Share

ROM next argues that it has lost market share due to Armaid's alleged infringement, because consumers who would otherwise have purchased a Rolflex are instead buying an Armaid2.  As evidence of ROM's lost market share, ROM points to Stahl's affidavit, which states that Armaid has sold "over 1,500" Armaid2 devices, which has reduced ROM's market share "to something less than one-hundred percent," ECF No. 8-1 ¶ 4, and that since August 2020, sales of the Rolflex "are down from prior years and have been slow to increase," *id.* ¶ 5.

However, "[e]vidence of potential lost sales alone does not demonstrate irreparable harm." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017); *see Apple I*, 678 F.3d at 1324-25 ("A mere showing that [the patentee] might lose some insubstantial market share as a result of [the defendant's] infringement is not enough.").  The evidence provided through Stahl's affidavit may be sufficient to establish lost sales, but it does not suggest that any lost sales have caused ROM additional or different harm that would defy valuation, such as price erosion or lost accounts with distributors or retailers.  *See Bosch*, 659 F.3d at 1154. And the apparent size and simplicity of the businesses involved in this case—the Rolflex and Armaid2 are, respectively, ROM's and Armaid's primary products, and

they have relatively low sales numbers[7]—also suggest that money damages will be calculable if the Armaid2 is eventually found to have infringed the D155 patent.

In a related argument, ROM asserts that because it is losing revenue to Armaid, it has less cash to invest in marketing, which is inhibiting its growth.[8] However, ROM has not submitted any evidence of its financial condition, and the evidence of lost sales alone does not establish that the revenue ROM has allegedly lost to Armaid has meaningfully impacted its marketing budget or otherwise inhibited it from pursuing business opportunities; such an inference would be a step too far. Additionally, Cross asserts—without contravention from ROM—that ROM has lost money "every year since it was created, including the four years before [Armaid] began to sell the Armaid2." ECF No. 19-1 ¶ 44. Even taking as true Stahl's assertion that Rolflex sales are down recently, this is insufficient to establish that ROM's business operations have been harmed by any sales that it has lost to the Armaid2.

Additionally, ROM has not established a causal nexus between Armaid's alleged infringement and ROM's asserted loss of market share. *See Apple I*, 678 F.3d at 1324. ROM writes that, before the Armaid2 was introduced, the Rolflex was the "only product[] on the market embodying the design of the [D155 patent] that also functioned as [a] leveraged self-massage device[] for arms, legs, feet, and hands."

---

[7] Stahl states in his affidavit that Armaid has sold about 1,500 Armaid2 devices as of May 2021, which is over a year since the Armaid2 went on the market. The parties have not submitted any evidence of ROM's sales numbers.

[8] ROM does not argue that it has had to increase its marketing costs to compensate for Armaid's alleged infringement. *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1378 (Fed Cir. 2020).

ECF No. 8 at 10.  ROM seems to suggest, therefore, that the Armaid2 and the Rolflex are the only two products in the relevant market.  However, as I have previously explained, the Armaid2—unlike the Rolflex—is not intended to be used on parts of the body other than the arms.  This difference in function suggests that the Armaid2 and Rolflex are not direct competitors.

Furthermore, the weight of the evidence that is currently in the record shows that, to the extent that the Rolflex and Armaid2 compete for customers, they compete primarily on function, not design.  Both parties have submitted customer and media reviews, which focus entirely on the therapeutic effectiveness of the devices, such as a 2016 review of the Rubbit (the Rolflex's predecessor) in *Climbing* magazine.  Similarly, Armaid has submitted evidence suggesting that there are several other self-massage devices on the market.  Although ROM points out that these other devices do not share the basic shape of the Rolflex or Armaid2, it concedes that the other devices "serv[e] as self-massage devices," ECF No. 26 at 8, and it does not contravene Armaid's evidence that the other devices in fact compete with the Rolflex and Armaid2 for customers.  In short, ROM has not established that any sales it has lost to the Armaid2 were caused by the Armaid2's allegedly infringing ornamental design, rather than the two products' functional differences.

For these reasons, ROM has not shown that it will likely suffer irreparable harm based on lost market share.

### iii.    Business Opportunities and Goodwill

ROM further contends that it has lost publicity and business opportunities to the Armaid2.  First, ROM writes in its motion that in March 2021, Armaid "got in

touch with a well-known online businessman and investor, Tim Ferriss, who sent an e-mail to his millions of followers referring the [Armaid2] to them for arm and leg massaging needs." ECF No. 8 at 13. ROM asserts that Ferriss subsequently declined to recommend the Rolflex, and argues that this lost publicity may be due to Ferriss's reluctance to recommend a product with a similar design to one that he has already recommended.

ROM's argument is not supported by the evidence for several reasons. First, it has not been shown that Ferriss was even recommending the Armaid2. Cross's affidavit directs the court to a YouTube video posted in January 2017, in which Ferriss is shown demonstrating and recommending the Armaid1 to viewers. *See* Tim Ferriss, *Tim Ferriss's Elbow Routine*, YouTube (Jan. 30, 2017), https://www.youtube.com/watch?v=BzXM3mPs6z0. Armaid has also submitted a copy of Ferriss's later email that ROM was apparently referring to, which is a blog post by Ferriss dated March 19, 2021, and which was emailed to subscribers on the same day. ECF No. 19-17 at 1. Under the caption, "Device I'm using for elbow pain, tendinitis, etc.," Ferriss writes that the "Armaid . . . was put on [his] radar by competitive rock climbers," and that the "Armaid appears to be working surprisingly well to resolve" Ferriss's "forearm and elbow issues," and "nagging tightness and pain." *Id.* In light of Ferris's previous recommendation of the Armaid1, the generic reference to "Armaid" is just as likely to have meant the Armaid1 as the Armaid2.

Second, ROM does not show any causal nexus between this lost publicity and Armaid's alleged infringement of the D155 patent. The blog post does not mention the appearance of the Armaid device, implicitly or explicitly, but instead states that

the Armaid "appears to be working surprisingly well to resolve" Ferriss's "forearm and elbow issues."   ECF No. 19-17 at 1.   This focus on utility, not appearance, indicates that the Armaid2's allegedly infringing design played no causal role in obtaining Ferriss's recommendation.

Next, ROM argues that it has lost potential retail opportunities to Armaid. Lost retail opportunities are more than mere lost sales, and may constitute irreparable harm.  *See Bosch*, 659 F.3d at 1153-54.  In Stahl's affidavit, he asserts that ROM has "received questions and concerns [about the Armaid2] from potential retail partners who were interested in selling [the Rolflex]."  ECF No. 8-1 ¶ 5.  Stahl's affidavit does not provide any specifics about the number or size of these retailers, or even any direct assertion that ROM did not secure these placements and Armaid did.

Finally, ROM argues that the Armaid2's existence on the market is hurting its reputation by undermining ROM's advertising statements that the Rolflex is unique. As Armaid agrees, reputational damage—being difficult to quantify—may establish irreparable injury in the patent context, even without direct evidence of consumer confusion.  *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013).  For instance, a patentee's "reputation as an innovator" may be irreparably damaged by infringement.  *Id.* at 1344.  Again, however, ROM has not submitted any credible evidence of reputational damage, except for Stahl's affidavit, which speculates that the Armaid2's presence on the market "could definitely hurt [ROM's] goodwill with [its] customers."  ECF No. 8-1 ¶ 7.  This is insufficient to demonstrate irreparable harm.

In sum, ROM's argument that it is likely to suffer irreparable harm without a preliminary injunction are not supported by the evidence.

## IV.  CONCLUSION

Having concluded that ROM has failed to establish either a likelihood of success on the merits or irreparable harm, I deny its motion and I do not reach the third and fourth factors required for an award of preliminary injunctive relief. Accordingly, ROM's Motion for Preliminary Injunction (ECF No. 8) is **DENIED**.

**SO ORDERED.**

**Dated this 6th day of August, 2021.**

          **_____/s/ JON D. LEVY_____**
          **CHIEF U.S. DISTRICT JUDGE**